UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
**LUIS ARELLANO, PEDRO LEON, BALTHAZAR MARTINEZ,
KEVIN VEGA**

on behalf of themselves, and those similarly situated,


      Plaintiffs,


                                                     **COLLECTIVE ACTION
                                                     COMPLAINT
                                                     WITH JURY DEMAND**
v.

HIGHLINE CONSTRUCTION GROUP, LLC.,
Mark Dobbin, in his individual and professional capacity


Defendants, jointly and severally.


----------------------------------------------------------------x


## NATURE OF THE ACTION


Plaintiffs, LUIS ARELANNO, PEDRO LEON, BALTHAZAR MARTINEZ, and KEVIN

VEGA (hereafter "Plaintiffs"), by and through undersigned counsel Mirer Mazzocchi & Julien,

PLLC, against Defendants HIGHLINE CONSTRUCTION GROUP, LLC., Mark Dobbin

(collectively "Defendants") allege as follows:

      1.      Defendants promote themselves as a "full-service construction management and

general contracting firm founded by [Defendant] Mark Dobbin to deliver the utmost in

craftsmanship to esteemed architects, designers and property owners in New York's luxury

residential market … [completing] significant work in Manhattan's most desirable landmark

buildings as well as some of its most stunning new modern towers … [with] an increasingly

impressive portfolio of A-list projects and repeat business with esteemed architects and designers attest to the efficient management skills and superior customer care practiced at Highline Construction Group."

2.      "Mark [Dobbin] and senior management [are] directly involved in every project from pre-construction planning through completion and this high level of personalized attention provides meticulous execution of increasingly complex build-outs."

3.      Plaintiffs are of Indigenous Mexican national origin and are actual or perceived immigrants (hereafter referred to collectively as "immigrants and/or protected status" to denote all such status or any combination thereof) hired directly by Defendants to work as full-time employees of Highline Construction Group, LLC between on or about October 1, 2017 to on or about March 2020.

4.      Plaintiffs bring this action to redress unlawful national origin discrimination and discrimination based on actual or perceived immigration status pursuant to Section the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, et seq. ("NYCHRL") seeking monetary, declaratory and injunctive relief.

5.      Plaintiffs also bring this action to recover overtime, unlawful deductions and penalties for unlawful retaliation and for failure to provide proper wage notices and wage statements pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 209 *et seq.* and the New York Labor Law ("NYLL"), §§ 650 et seq. Plaintiffs bring this action on behalf of themselves and similarly situated current and former employees who elect to opt-in to this action pursuant to 29 U.S.C. §§ 201 et seq. of the FLSA, and specifically, the collective action provision of 29 U.S.C. § 216(b), to remedy violations of the wage-and-hour provisions of the FLSA.

6.    Plaintiffs and members of the putative Collective Action seek remedy for willful violation of state and federal wage and hour laws since at least in or about March 12, 2018, in violation of the FLSA and since at least on or about March 12, 2015 in violation of the NYLL.

7.    Plaintiffs further allege disparate pay based on national origin pursuant to NYLL 194(1) against Defendants, as their employers under the NYLL.

8.    Because of their protected status, Plaintiffs were assigned to outrageously dangerous and life-threatening work that subjected them to reckless and or/willful exposure to hazardous chemicals and chronic occupational hazards.

9.    Specifically, Plaintiffs were directed to remove asbestos from multiple locations without the proper training, licensure or personal protective equipment ("PPE"). Such acts are in direct violation of laws intended to protect workers' lives, health and safety. Plaintiffs' lives were intentionally put at risk because of their protected status and Plaintiffs are now in constant fear of latent asbestos disease and/or related death. As such Plaintiffs also bring a claim for intentional infliction of emotional distress.

10.    Given what Defendants know or should have known regarding the dangers of asbestos, the fact that specific licensure, training and PPE is required under the law, their conduct is not only criminal in nature, it is per se extreme, outrageous, so much that it shocks the conscience.

11.    Throughout the course of their employment Defendants intentionally and recklessly subjected Plaintiffs to extreme and outrageously dangerous conditions, to an egregious racially hostile work environment, and to disparate pay and stolen wages, because of their protected status.

12.    Furthermore and because of their protected status, Plaintiffs were treated like a disposable workforce. Plaintiffs were further subjected to constant abuse and harassment,

including the use of epithets, slurs and racist monikers, such as "Immigrant" "Shitty Immigrants" "Shit Boys", "Stupid Boys" and by comparing Plaintiffs to animals, such as being called "Donkeys" and "Monkey" "fucking sick bastards". Because of this egregious hostile work environment, Plaintiffs were humiliated and dehumanized.

13.     Defendants by these acts engaged in intentional discrimination because of their protected status, willfully paid Plaintiffs unlawfully, subjected them to disparate rules, pay and to physical and/ or egregious emotional injury on account of their intentional, negligent and/or reckless disregard for Plaintiffs' life and limb.

14.     Defendants thus have caused Plaintiffs to suffer substantial economic and non-economic damages, severe mental anguish, emotional distress, and further such acts that warrant an award of punitive damages.

15.     Although Defendants possessed full knowledge of the discriminatory, unsafe working environment, and unfair labor and wage practices, no actions were taken to report or remedy any of Plaintiffs' injuries, or to comply with discrimination and wage laws. Instead, once they were on notice that Plaintiffs sought to activate their rights at a Federal Labor agency and then by retaining the undersigned, Defendants double-downed on their harassment of Plaintiffs by threatening them with ICE retaliation and then ultimately by firing them. By their egregious conduct, Defendants caused Plaintiffs intense psychological and emotional injuries, potential serious occupational illness, loss of dignity, and financial harm. Indeed, in seeking out what they considered to be an invisible and disposable workforce Defendants sought to create a new business model built on exploitation of cheap immigrant labor while catering to the "to esteemed architects, designers and property owners in New York's luxury residential market."

## **JURISDICTION**

16.     Jurisdiction is proper as this Court has original federal question jurisdiction under 28 U.S.C. § 1331 since this case is brought under the FLSA, 29 U.S.C. §§ 201, et seq. This Court has supplemental jurisdiction over the NYLL claims and Plaintiffs' individual claims, as they are so related that they form part of the same case or controversy under Article III of the United States Constitution and are properly before this court pursuant to 28 U.S.C. § 1367.

17.     As stated below, Defendants are an employer engaged in commerce as defined in the FLSA, 29 U.S.C. § 203(s).

18.     Defendants are subject to personal jurisdiction in the State of New York since they are located in New York County, State of New York and do business in this state.

19.     Venue is proper in this District because Defendants conducts business in this Judicial District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

### Plaintiffs

20.     Plaintiff Luis Arellano ("Arellano") is a Hispanic male of Mexican national origin and indigenous ethnicity. He is a resident of Manhattan County. Plaintiff Arellano was jointly employed by Defendants from on or about November 1, 2017 to on or around February 28, 2020. At all times relevant Defendants perceived Arellano as an immigrant. At all times relevant he worked approximately 50-60 hours a week and sporadically for weeks at a time approximately 75 hours a week. At all times relevant Plaintiff Arellano was Defendants' employee within the meaning of the FLSA and NYLL 29 USC 203(e); NY Lab. Law 651(5), and the NYCHRL.

21.     Plaintiff Pedro Leon ("Leon") is a Hispanic male of Mexican national origin and indigenous ethnicity. He is a resident of Kings County. Plaintiff Leon was jointly employed by

Defendants from on or about October 1, 2017 to on or around March 15, 2020. At all times relevant Defendants perceived Leon as an immigrant. At all times relevant he worked approximately 50-60 hours a week and sporadically for weeks at a time approximately 75 hours a week. At all times relevant Plaintiff Leon was Defendants' employee within the meaning of the FLSA and NYLL 29 USC 203(e); NY Lab. Law 651(5), and the NYCHRL.

22.    Plaintiff Balthazar Martinez ("Martinez") is a Hispanic male of Mexican national origin and indigenous ethnicity. He is a resident of Kings County. Plaintiff Martinez was jointly employed by Defendants from on or about December 19, 2017 to on nor about February 28, 2020. At all times relevant Defendants perceived Martinez as an immigrant. At all times relevant he worked approximately 50-60 hours a week and sporadically for weeks at a time approximately 75 hours a week. At all times relevant Plaintiff Martinez was Defendants' employee within the meaning of the FLSA and NYLL 29 USC 203(e); NY Lab. Law 651(5), and the NYCHRL.

23.    Plaintiff Kevin Vega ("Vega") is a Hispanic male of Mexican national origin and indigenous ethnicity. He is a resident of Queens County. Plaintiff Vega was jointly employed by Defendants from on or about mid-November 2017 to on or about March 13, 2020. At all times relevant Defendants perceived Vega as an immigrant. At all times relevant he worked approximately 50-60 hours a week and sporadically for weeks at a time approximately 75 hours a week. At all times relevant Plaintiff Vega was Defendants' employee within the meaning of the FLSA and NYLL 29 USC 203(e); NY Lab. Law 651(5), and the NYCHRL.

**Defendants**

*Corporate Defendants*

24.    Upon information and belief Defendant HIGHLINE CONSTRUCTION GROUP, LLC ("HIGHLINE") is a privately held full-service construction management and general

contracting firm headquartered in New York, NY. According to their website, Defendant Mark Dobbin established Highline Construction Group in 2011and has since "buil[t] for some of the Manhattan's most celebrated architects and designers … [completing] significant work in Manhattan's most desirable landmark buildings as well as some of its most stunning new modern towers."

25.    Upon information and belief Highline Construction Group is headquartered in Manhattan County at 227 West 29th Street, Suite 6, New York, NY 10001.

26.    Defendant Highline at all relevant times was an employer of Plaintiffs as defined by FLSA, the NYCHRL and NYLL.

27.     Defendant Highline has been at all times relevant engaged in commerce within the meaning of the FLSA.

28.    Upon information and belief, Defendant Highline is an enterprise whose annual gross volume of sales made, or business done, is in excess of $500,000. Specifically, Defendant Highline is a thriving residential construction company with contracts in elite neighborhoods for jobs, many of which individually garner 6 figure sums.

29.    Upon information and belief, as well as first-hand knowledge of Plaintiffs, Defendant Highline regularly conducted interstate business. Specifically, Defendant Highline routinely uses construction materials from out of state, such as wood, steel, sheetrock, etc.

30.    Further at all times relevant, Defendant Highline was an employer within the meaning of the FLSA, the NYLL and the NYCHRL.

*Individual Defendants*

31.     Defendant Mark Dobbin ("Dobbin") is the founder, owner and principal of Highline. Upon information and belief, Dobbin resides in Long Island, New York. At all times relevant, Dobbin regularly performed work in New York County at the headquarters of Highline.

32.     At all times relevant, Dobbin was an operator, manager, principle, owner, and an individual engaged in active management of the day-to-day business operations of Highline.

33.     At all times relevant, Dobbin was Plaintiffs' employer as defined by the FLSA, the NYLL and NYCHRL.

34.     At all times relevant herein, Dobbin exercised and retained control over all aspects of the day-to-day functions of Highline, including: (i) operational control over the enterprise, including actively managing, supervising, and directing the business operations; (ii) power to establish, and did establish, the terms of employment of Plaintiffs and others similarly situated; (iii) power to hire and fire; (iv) control over employee work schedules; (v) the ability to determine the rate and method of employee compensation; and (vi) maintenance employment records of Defendants Highline.

35.     At all times relevant herein, Dobbin acted directly and indirectly in the interest of Highline in relation to their employees, including Plaintiffs.

36.     At all times relevant herein, Dobbin had the authority to supervise the employees, including Plaintiffs, at Highline and all premises where Plaintiffs performed duties for Defendants.

37.     At all times relevant herein, Dobbin had the authority to and actually did direct the employees, including Plaintiffs, at Highline and all premises where Plaintiffs performed duties for Defendants.

38.     At all times relevant herein, Dobbin had the authority to hire and fire the employees, including Plaintiffs, of Highline.

39.     At all times relevant herein, Dobbin had the authority to make decisions about the workplace duties and hours of employees, including Plaintiffs, at Highline.

40.     At all times relevant herein, Dobbin had the authority to make decisions about the compensation of employees, including Plaintiffs, at Highline.

41.     At all times relevant herein, Dobbin had the authority to act with respect to supervising, directing, hiring and firing, making decisions about workplace duties and hours and making decisions about pay of Defendants' employees, including Plaintiffs.

## FACTUAL ALLEGATIONS

### *Defendants' Operation*

42.     Highline Construction Group, LLC was founded by Mark Dobbin in 2011. He is the founder, owner and principal of Highline.

43.     "Highline Construction Group is a full-service construction management and general contracting firm founded by Mark Dobbin to deliver the utmost in craftsmanship to esteemed architects, designers and property owners in New York's luxury residential market … has completed significant work in Manhattan's most desirable landmark buildings as well as some of its most stunning new modern towers."

44.     "Mark and senior management [are] directly involved in every project from pre-construction planning through completion"

45.     Throughout the relevant period Plaintiffs performed work at various locations across New York, New Jersey and in Long Island, Mark Dobbin's own home in Garden City, Long Island and another Senior Manager's home in Secaucus, New Jersey.

46.     Other Addresses where Plaintiffs performed their Highline duties included but were not limited to: 51 Crosby Street Apt 4PH; 520 West 19 Street, Apt 4; 535 Park Ave , Apt 8AB; 543 Gates Ave; 55 E 72 St Apt 4S; 551 West 21 Street, PH20; 56 Jaffray Park; 580 Park Ave; 60 Beach Street, Apt 4D; 60 East 86 Street, Apt #7; 812 5th Ave; 860 5th Ave #19B/20B 885 Park Ave 7A; 890 Broadway 2nd Floor; 907 5th Ave, Apt 12W; 907 5th Ave, Apt 8W; 911 Park Ave; 941 Park Ave, Apt 11C; 70 Vestry Street, Apt 6A; 60 Warren Street, Apt 4; 635 Park Ave, #PH2; 645 5th Ave Olympic Tower; 65 E 76 Street, 8BC; 60 Warren Street, Apt 3; 60 Warren Street, Apt 3; 755 Park Ave, Apt 9K; 770 Park Ave #7D; 956 5th Ave 10th Floor; 960 Park Ave Apt # 2; 983 Park Ave Apt #3; 44 West 77th Street; 325 West End Avenue; 121 Washington Street; And 960 Park Avenue.

### *Plaintiffs' Hire By Defendants*

47.     On or about October 1, 2017, Plaintiff Leon was hired by Defendants and paid a straight time hourly rate of $17.00 per hour with no overtime premium paid after 40 hours. He was hired at the suggestion of Miguel Vidal, Mark Dobbin's "right hand man" and "supervisor of all Highline worksites". On his first day Plaintiff Leon met Mark Dobbin, where he was "welcomed to the company". Dobbin provided Plaintiff Leon a Highline ID, uniform, which consisted of a gray polo shirt with the words "Highline Construction" embossed on the chest and a hard hat and was told that he and other workers should always wear them.

48.     Thereafter Plaintiff Arellano was hired by Defendants on approximately on November 1, 2017 and paid a straight time hourly rate of $17.00 per hour with no overtime premium paid after 40 hours. Plaintiff Arellano heard about the job at Highline from his cousin, Plaintiff Leon. He too received a Highline ID; the same uniform, which consisted of a gray polo

shirt with the words "Highline Construction" embossed on the chest and a hard hat and was told that he and other workers should always wear them.

49.    Shortly after Arellano was hired, Plaintiff Vega met Vidal on a small job where he was working. Vidal stated that "his company Highline was hiring, and provided his phone number to Vega. Soon thereafter, he was hired by Defendants on approximately on November 15, 2017 and paid a straight time hourly rate of $18.00 per hour with no overtime premium paid after 40 hours. He too received a Highline ID; the same uniform, which consisted of a gray polo shirt with the words "Highline Construction" embossed on the chest and a hard hat and was told that he and other workers should always wear them.

50.    On or around mid-December 2017, Plaintiff Martinez received a phone call from Miguel Vidal who identified himself as someone that worked for a company called Highline Construction Group and that he was looking to hire a laborer. He further stated that he received his phone number from Plaintiff Vega and offered him the job. Plaintiff Martinez was hired by Defendants on approximately on December 18, 2017 and paid a straight time hourly rate of $17.00 per hour with no overtime premium paid after 40 hours. He too received a Highline ID; the same uniform, which consisted of a gray polo shirt with the words "Highline Construction" embossed on the chest and a hard hat and was told that he and other workers should always wear them.

51.    During the relevant period, Plaintiffs worked at all times alongside non-indigenous Mexican and/or non-actual or perceived immigrant Highline laborers whom received better treatment non-discriminatory treatment and pay than Plaintiffs on account of their national origin and/or perceived non-immigrant status.

**Defendants' Control of Plaintiffs**

52.    At all times relevant, all Plaintiffs were uniformly subject to the common allegations (except for Plaintiff Vega who earned one dollar more than the rest) described *infra* while performing their work.

53.    That is, at all times relevant Plaintiffs worked alongside Highline workers who were subjected to better treatment because of their national origin/and or perceived or actual immigrant status. At all times relevant, Plaintiffs were hired on the same basis, paid approximately the same hourly rate (except for Plaintiff Vega who earned one dollar more than the rest), performed the same work, and were subject to the same discriminatory and harassing terms and conditions of employment complained of herein.

54.    Further, all Plaintiffs worked for Defendants in capacities that were integral to the work of Highline. These included but not limited to:

- Remediate Asbestos
- Erect Scaffolding/work on scaffolding on exterior and interior of homes
- Carpentry
- Demolition
- Painting
- Sanding
- Carry heavy loads of materials from trucks to worksites
- Cleaning/removal of waste

55.    Collectively, and individually Plaintiffs performed job duties essential to Defendants' operations.

56. At all times relevant Plaintiffs were under Defendants actual control and performed work for their benefit at various sites that Highline Construction, LLC performed construction management and general contracting services.

57. At all times relevant Defendants provided Plaintiffs with their assignment of work as well as the materials, machines and specialized tools to perform such work.

58. At all times relevant Defendants provided Plaintiffs with Highline Construction, Inc. ID cards, uniforms with Highline Construction, Inc insignia and hardhats.

59. At all times relevant Defendants transported Plaintiffs in Defendant's vehicles with the Highline Construction, Inc insignia painted on the side of such, to job sites within New York City, Long Island and New Jersey.

60. At all times relevant Plaintiffs were directly supervised by Dobbin and other Highline Constructions Inc. Superintendents, Supervisors and Managers.

61. Plaintiffs were instructed by Defendants to come to the Highline Construction, Inc, headquarters to install phone app called ExakTime Mobile so that Plaintiffs could electronically sign in and out of work every day – essentially a cyber punch in clock.

62. Plaintiffs were instructed by Defendants to pick up their checks every two weeks from Human Resources at the Highline Headquarters located at 227 West 29th Street, Suite 6, New York, NY 10001 where they would sign for their checks on a roster with Highline Construction, Inc.'s Logo.

63.   More recently however, Plaintiffs would receive their checks from Johnny (lnu) who would drive the Highline Construction, Inc. vehicle to each job site to drop off checks to Plaintiffs and others similarly situated.

## COMMON DISCRIMINATION ALLEGATIONS

**Highline Construction, Inc.'s Systemic Discrimination Against Indigenous Mexicans/or because of their Perceived Immigrant Status**

64.   The following allegations are common to all Plaintiffs and operative as to all Plaintiffs alleging discrimination claims within the relevant period, as indicated in the counts, *infra*.

65.   Within days of becoming employed with Highline Construction, Inc, each Plaintiff realized that they and other perceived immigrant and/or indigenous Mexican workers were being subjected to disparate treatment, harassment and abuse. As described below, at all times relevant, all Plaintiffs were subject to such hostile work environment and disparate treatment because of their protected status.

66.   Highline's practices and personnel policies thus discriminate against Plaintiffs as indigenous Mexican and/or perceived Immigrants.

67.   That is, Highline maintains a caste system that systematically discriminates against indigenous Mexicans and/or perceived Immigrants and limits their compensation and moreover subjects them to harassment as well as disparate work rules by coworkers, supervisors and managers because of their protected status.

68.   Not only does Defendants permit managers, supervisors, other agents to act in a discriminatory manner, but also the company's uppermost management tacitly endorses, and directs discriminatory practices against Plaintiffs as indigenous Mexicans and/or perceived Immigrants with respect to discipline, terms and conditions of employment, and wage setting.

69.    Thus, Defendants have engaged, and continue to engage, in systemic and pervasive national origin and immigration status discrimination against indigenous Mexicans and/or perceived Immigrants, including but not limited to the following practices applicable to all Plaintiffs.

**Hostile Work Environment Because of Perceived Immigration Status/ National Origin**

70.    At all times during the relevant Discrimination period, on a daily basis, Plaintiffs were routinely called offensive and racist epithets by their direct supervisors including but not limited to: Mark Dobbin, James Day, Eddy Kerman and John Brooney including: "Immigrant" "Shitty Immigrants" "Fucking Immigrants" "Shit Boys", "Stupid Boys" "fucking sick bastard" and by comparing Plaintiffs to animals, such as being called "Donkeys" and "Monkey" and other disgustingly racist and highly offensive slurs.

71.    Plaintiffs were subjected to such intimidation, ridicule, name calling, and taunts, because of their national origin and/or perceived and/or actual immigrant status.

72.    Thus, in the relevant period, from at least October 2017 to the present, Highline Construction, Inc. has maintained a continuing common practice of verbal abuse and harassment of indigenous Mexicans and/or perceived Immigrant employees by Highline owners, supervisors, managers and other agents resulting in a hostile work environment for Highline's indigenous Mexican immigrant employees. The names referenced above were addressed to Plaintiffs generally and each Plaintiff was called discriminatory epithets daily. Thus, all Plaintiffs have been called these humiliating names on an ongoing basis with such severity, duration and frequency as to establish a hostile working environment.

73.    Plaintiffs were called epithets on a daily basis in the course of performing their employment. These epithets became such a regular part of the work that subjection to such names became a term and condition of Plaintiffs' employment.

74.    The use of these terms was objectively offensive and intolerable and subjectively wounding and intolerable to Plaintiffs.

75.    Because of this dehumanizing and humiliating treatment, Plaintiffs became alienated from family, friends and lovers; suffered extreme depression, anxiety and other physical manifestations of stress.

76.    All Plaintiffs continue to suffer egregious emotional distress as a result of Defendants' actions.

**Defendants Engaged in A Common Practice of Failing to Train or Protect Immigrant Workers, Thus Creating A Disparate Workload, A Hostile Work Environment, and Intentionally Inflicted Emotional Distress upon Plaintiffs**

77.    In addition to subjecting Plaintiffs to an objectively and subjectively hostile and harassing work environment by the use of racist epithets, Defendants also systematically exposed Plaintiffs to disparate treatment and an objectively and subjectively hostile and intolerable work environment by exposure to more onerous and dangerous work because of Plaintiffs' national origin and/or immigrant status.

78.    Although the Plaintiffs were hired to perform specialized and dangerous work on Defendants' worksites, Defendants also employed a group of similarly situated workers who were of other national origin/and or perceived as actual or non-immigrants who performed the exact same duties as Plaintiffs.

79. Such perceived non-immigrant workers were provided much safer and humane conditions, leaving Plaintiffs to engage in more difficult, dangerous and more back-breaking aspects of these duties than their non-immigrant counterparts.

80. Specifically, Defendants exposed Plaintiffs to more onerous and intolerably dangerous working conditions by deliberately directing Plaintiffs to remediate asbestos without the proper, training, licensure, PPE as required under the law while not directing non-immigrant employees to the same, reserving this outrageously life threatening for only immigrant workers, thereby creating a hostile work environment and a disparate workload.

81. Defendants' intention to discriminate against Plaintiffs because of their protected status was so pronounced as to cause Defendants to break a panoply of federal laws in addition to unlawfully depriving Plaintiffs of training and PPE.

82. Although Defendants were required, and in the best position, to train Plaintiffs in the proper use of such a toxic agent or to hire licensed asbestos remediation professionals, Defendants intentionally denied Plaintiffs such and failed to articulate warnings and instructions to Plaintiffs on how to defend against occupational illness and preventable occupational injuries and diseas.

83. Thus, Plaintiffs were unreasonably exposed to such hazardous chemicals and chronic occupational hazards, while the non-Immigrant workers were not.

84. Throughout the relevant time, such refusal to train, license, and protect Plaintiffs against the exposures of asbestos compounded the exposed harm—although Highline was aware that this work was outrageously dangerous and life threatening and should have contracted the appropriate companies licensed to remove asbestos, this dangerous manual labor was reserved solely for Plaintiffs and others similarly situated.

85.    Plaintiffs removed asbestos several times throughout the City and has provided the undersigned with photographs of such work. One Plaintiff stated that James Day, Licensed Site Superintendent of Highline, directed such work exclaiming, "you have to remove this because Mark [Dobbin] doesn't want to pay for a Company to do this work. It's too expensive."

86.    Such disparate exposure to asbestos because of Plaintiffs' national origin and/or because of Plaintiffs' perceived immigrant status amounts to a disparately dangerous and onerous workload.

87.    Moreover, because such exposure to needlessly dangerous conditions was objectively and subjectively intolerable and motivated by Plaintiffs' protected status, it amounts to a hostile work environment.

88.    Further, given what Defendants know or should have known regarding the dangers of asbestos, the fact that specific licensure, training and PPE is required under the law, their conduct is not only criminal in nature, it is per se extreme, outrageous, so much that it shocks the conscience and amount to intentional infliction of emotional distress.

## Plaintiffs Were Subjected to Disparate Pay Based on Perceived Immigration Status under NYCHRL

89.    While at all times relevant, risking life and limb for Defendants, suffering discrimination, harassment and disparate dangerous workloads, Plaintiffs also received disparately low pay on account of their perceived immigration status, Hispanic race and national origin.

90.    At all times relevant, similarly situated workers of non-protected status were paid approximately $22.00 - $23.00 per hour while Plaintiffs, received only $17.00 per hour with the exception of Plaintiff Vega who received $18.00 per hour after "begging Mark for a raise".

91.    At all times relevant, Plaintiffs performed equal work to their comparators but received lesser pay because of their protected status.

92.     This discrepancy cannot be accounted for by a seniority system; (b) a merit system; or (c) or any *bonafide* factor other than perceived immigration status, race or national origin.

**Plaintiffs Suffer Emotional Distress as a Result of Defendants' Discrimination**

93.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, all Plaintiffs have each suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence, familial, marital issues and loss of enjoyment of life.

## COMMON NYLL and FLSA ALLEGATIONS

94.     The following allegations are common to all Plaintiffs, victims of a common scheme by Defendants to violate the NYLL and/or FLSA.

95.     At all times relevant, Plaintiffs, and all similarly situated persons pursuant to FLSA 216, were covered employees within the meaning of NYLL and/or FLSA.

96.     At all times relevant, Plaintiffs, and all similarly situated persons pursuant to FLSA 216, routinely worked in excess of 50 hours per week.

97.     At all times relevant, Plaintiffs, and all similarly situated persons pursuant to FLSA 216, were paid straight time for all hours worked in excess of 40 per week.

98.      At all times relevant, Defendants failed to pay Plaintiffs and similarly situated persons at the overtime rate for all hours in excess of forty (40) hours per workweek, in violation of the overtime provisions of FLSA, 29 U.S.C. § 207 and NYLL §§650 *et seq.* and regulations promulgated thereunder..

99.     Initially Defendants paid Plaintiffs in cash every two weeks for approximately 3 months. Thereafter, at all times relevant, Plaintiffs were instructed by Defendants to pick up their checks every two weeks from Human Resources at the Highline Headquarters located at 227 West 29th Street, Suite 6, New York, NY 10001 where they would sign for checks on a roster with Highline Construction, Inc.'s logo.

100.    At no point did Defendants provide Plaintiffs with a wage statement in their primary language containing the amount of hours worked and wages earned by Plaintiffs each given week, including the basis of Plaintiffs' rate or rates of pay; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the name of the employer, and any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; and the telephone number of the employer.

101.    At no point did Defendants provide Plaintiffs with a wage notice in their primary language, containing Plaintiffs' rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the regular pay day designated by the employer in accordance with NYLL, Article 6, § 191; the name of the employer, and any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; and the telephone number of the employer.

102.    Because Defendants failed to provide any wage records to Plaintiffs as required by NYLL, Plaintiffs' recollection provide the basis of the factual allegations regarding the dates and times of their employment.

103.    Because Plaintiffs must base their factual allegations on their own recollection, the dates and times of employment are alleged with the qualifications "on or about" and "approximately."

104.    Plaintiffs were all paid pursuant to the same policies of Defendants that applied to all similarly situated employees as Plaintiffs with protected status, including: failing to pay overtime; failing to provide wage statements; and failing to provide wage notices.

105.    Plaintiffs' work was performed in the normal course of Defendants' business and was integrated into Defendants' business.

106.    Defendants' violations of the wage and hour provisions of NYLL were intentional and willful.

## FLSA COLLECTIVE ACTION ALLEGATIONS

107.    Plaintiffs bring their overtime claims for relief as a collective action under Section 16(b), 29 U.S.C. § 216(b) of the FLSA on behalf of all hourly workers employed by Defendants at Highline Construction between on or about March 12, 2018 and the date of final judgment in this matter that elect to opt in to this action. Such Plaintiffs are hereinafter referred to as the "FLSA Collective Plaintiffs."

108.    Defendants committed the acts alleged in this complaint knowingly, intentionally and willfully within the meaning of FLSA, 29 U.S.C. § 216.

109.    At all times relevant to this complaint, and upon information and belief, Plaintiffs and the FLSA Collective Plaintiffs are and/or have been similarly situated, and have had substantially similar compensation provisions. Thus, the claims of Plaintiffs are essentially the same as those of the FLSA Collective Plaintiffs.

110.    Plaintiffs and the FLSA Collective Plaintiffs have been subject to Defendants' policies and practices of willfully failing to pay overtime at a rate of one and a half times their hourly rate for hours worked in excess of forty (40) per workweek in violation of FLSA, 29 U.S.C. § 207.

111.    For notice and all other purposes related to claims brought under FLSA, 29 U.S.C. § 216(b), the names and addresses of the FLSA Collective Plaintiffs are available from Defendants' records. Notice can be provided via first class mail to the last address known to Defendants for each of the FLSA Collective Plaintiffs.

## COMMON NYLL 194 DISPARATE PAY CLAIMS AS TO ALL PLAINTIFFS AND THOSE SIMILARLY SITUATED

112.    From July 10, 2019, in addition to the harassment and wage theft suffered by all Plaintiffs, they were also subjected to disparate pay because of their protected status by Defendants.

113.    Plaintiffs performed equal work, requiring equal skill, effort and responsibility performed under the same working conditions as those similarly situated without perceived protected status.

114.    Those similarly situated without perceived protected status are not more qualified, experienced or educated than Plaintiffs.

115.    Nonetheless Plaintiffs made only $17.00/$18.00 per hour for performing the same job—equal work—than those similarly situated without perceived protected status whom upon information and belief made approximately $22.00/$23.00 per hour.

116.    Thus Plaintiffs earned $5 to $6 less per hour than similarly situated employees perceived as non-immigrant for the first forty (40) hours worked.

117.    For all hours worked over 40 per week, the disparity increased to $7.50 to $9.00 per each hour worked over forty per week—in addition to the overtime amounts sought by Plaintiffs.

118.    This pay disparity cannot be explained by (a) a seniority system, (b) a merit system, (c) a system that measures earnings by quantity or quality of production, or (d) any bona fide factor other than Plaintiffs' protected status.

## RETALIATION IN VIOLATION OF FLSA, NYCHRL AND NYLL

119.    On or about May 2019, Plaintiff Martinez started working on a renovation at a house on 121 Washington Place in Manhattan. James Day was the job site supervisor. Working with him on the job site were two laborers, Joel Vilca and Plaintiff Vega, as well as three carpenters, two of whom were Irish and one Hispanic, named Colin (LNU), Martin (LNU), and Manuel Rodriguez. "Day could be a very mean boss, besides calling us racist names and making us take down asbestos which scared us, he would yell at us whenever he thought we were doing something wrong. I recall one incident where he yelled at my coworkers and I for wrapping sheet rock in covering to transport it. He said that if we ever did it again, something would happen to us. He didn't say what would happen, however."

120.    As recalled by Plaintiff Martinez, on or around Friday, "October 18, 2019, when I was on my way home from work, I received a phone call from Vidal. Vidal said something like, the boss doesn't want the three laborers (which I understood to mean me, Vega, and Vilca) working at the company anymore. Vidal said he didn't know why. Vidal then said that he recommended that I go to speak with Dobbin early in the morning on Monday at the office. I told Vidal that I would go to speak with Dobbin on Monday, and that I didn't know why I was being fired. Vidal

said he didn't know, and that I should go talk to Dobbin to have him explain to me why. We then ended the call."

121.    "The next day, Saturday, October 19, 2019, I received a phone call from Vilca. Vilca told me that he received a text message from Dobbin saying that we were fired. Vilca said that Dobbin wrote in his text message that we were being fired because he received fifteen complaints a day about us from Day, the supervisor who always discriminated and threatened us. Dobbin did not say what the complaints were about."

122.    On about Tuesday, October 23, 2019, [Plaintiff Martinez] "received a call from Andrew (lnu), one of the job site supervisors for Highline. Andrew asked me to come to work for him. I told Andrew I couldn't because Dobbin fired me. Andrew said to let him investigate, and he would call Vidal to see what was going on. About ten minutes later, I received a phone call from Vidal. Vidal told me to go to work for Andrew. I told Vidal that Dobbin had fired me. Vidal told me that Andrew had spoken to Dobbin, and told Dobbin that he wanted me to work for him. Vidal then said something like: Andrew suspended your suspension. I said ok, and said I would report to work."

123.    Soon thereafter, Plaintiffs agreed to file a complaint with the Department of Labor, because Plaintiffs felt that they had been fired unfairly and for discriminatory reasons. They also wanted to raise the illegal deprivation of their overtime wages: "We [Plaintiffs] also discussed how we felt that we had been discriminated against, because only [those with protected status] had been fired and harassed. We all agreed that we should file a complaint. I suggested that we go to the EEOC first, and my coworkers agreed. We also agreed that we would file complaints at the Labor Board and at the Department of Labor, and with any other government agency we could."

124.     On or around November 1, 2019, the U.S Department of Labor sent Plaintiffs a letter stating that a complaint filed with the Office of Federal Contract Compliance, where Plaintiffs tried to initiate a class action case against Defendants, lacked jurisdiction over Defendants and as such would refer the case to the Equal Employment Opportunity Commission. This letter was also sent to Defendants.

125.     Soon thereafter, Plaintiffs recall being "yelled at by Dobbin screaming at us that they were being sued, and that they were getting letters in the mail. [We] recall Dobbin and Vidal yelling [at us] you fucking guys are suing us. [We] I didn't say anything in response; rather, we just kept working. In the weeks that followed, in November and December 2019, [we] recall Dobbin and Vidal frequently accusing [us] of suing them. [We] recall a lot of verbal abuse during this period, and Dobbin and Vidal angrily saying over and over again, you fucking guys are suing us. [We] also recall them frequently saying that if we wanted to keep working there, they were going to start asking for papers. Dobbin and Vidal would make these statements whenever they visited the job site. [We] did not say anything in response."

126.     Also, in November and December 2019, Plaintiffs recall "Jim Day, the site supervisor, started assigning [Plaintiffs] harder and heavier work, for example carrying heavy things around the building. At the same time, he stopped assigning workers to help us when we asked for it. When we would ask him for help, he would say we had to do it by ourselves, and that we couldn't have any help. However, Day would assign us to help some of the white workers who were now working in the building whenever they needed help."

127.     Then on or around Thursday, January 2, 2020, Plaintiff Leon returned to work from his Christmas vacation. "At about 9 am, shortly after I started working for the day, Vidal called me on my cell phone and said that I didn't have a job anymore, and that my coworker [Plaintiff]

Vega did not have a job anymore. Vidal said this was coming from Dobbin. I asked him why we didn't have a job anymore. He said, because you and your coworkers are suing Highline. I said I didn't know what Vidal was talking about, and that I wanted to talk to Dobbin, so I could hear it out of his mouth. Vidal said that he and Dobbin were in agreement that we were going to be fired. I told Vidal that I needed my job, because I had three kids to take care of. Vidal said he and Dobbin didn't want us there anymore. Vidal then hung up the phone. I yelled over to [Plaintiff] Vega, who was working near me, and told him that we were both fired. Then, at that moment, Vidal called [Plaintiff] Vega. [Plaintiff] Vega spoke with Vidal, and then hung up the phone. [Plaintiff]Vega then said to me that Vidal just told him he was fired."

128.    "[Plaintiff] Vega and I [Plaintiff Leon] decided that we were going to go to the Employer's office, because we wanted to hear directly from Dobbin that we were fired. [Plaintiff] Vega and I left the job site on Washington Place and went to the office on W. 29th Street. When we got there, we saw Dobbin in the office. I said that we wanted to speak to him. I asked him why [Plaintiff] Vega and I were fired. Dobbin said that he didn't want to speak to us, and that we were fired because we were suing him. He said he didn't want anything to do with us, and that he didn't want to see us in his company anymore, so we had to leave. Dobbin then said that if we wanted to keep working there, we had to dismiss the lawsuit against him. Dobbin said that if we did dismiss the lawsuit and came back, he would give us a raise."

129.    Plaintiff Leon "responded that I didn't know what Dobbin was talking about. I told Dobbin that I wasn't suing him. Dobbin repeated that [Plaintiff] Vega and I were suing him. Dobbin then got very angry, and started yelling that he didn't want us working there anymore, and we had to get out. He said he was going to fire all of the Hispanics, and whoever wanted to stay,

he was going to ask for their papers. Vega then said we should leave, and we walked out. [Plaintiff] Vega did not say much during the conversation with Dobbin."

130.    Plaintiff Leon "didn't work the remainder of that day, or for the next two days. At some point, I called [the undersigned] my lawyer, and told her what happened to me. Over the weekend, [the undersigned] called me, and said that Plaintiff Vega and I could go back to work on Monday. I didn't receive any pay for the three days I was out of work."

131.    Plaintiff Vega and Plaintiff Leon returned to work at the Washington Place job site on Monday, January 6, 2020. "On my first day back at the job site, Dobbin was there, and he stared at me in a very angry manner. Dobbin did not say anything directly to me that day, but I heard him talking about me to other coworkers who were working near me, saying things like, This fucking guy.

132.    "Dobbin was also saying that he was going to fire everyone who didn't have papers, and that he was going to check everyone for an IRS pin number. Dobbin continued saying it throughout the week. Vidal was also saying it throughout the week. During the week, Day gave [Plaintiff] Martinez, [Plaintiff] Vega, Vilca, and I very heavy work, and kept pushing us to work faster. One day, Day also made us work through our lunch break to handle a delivery of materials.

133.    "I worked at the Washington Place job site for about a week. One day, Vidal told me that the next day, I had to report to a job site at 65 E. 76th Street in Manhattan, even though the Washington Place job site was still going. I also found out that [Plaintiff] Vega, my coworker, was assigned away from Washington Place as well, but I do not recall where he was sent. When I arrived at the E. 76th Street job site, I realized that I was the only Highline worker assigned to work there. There were other workers from other companies there, who work for subcontractors of Highline, but there were no other Highline workers besides me.

134.    "I continued as the sole Highline worker at the E. 76th Street job site until March 2020, when I was laid off because of the coronavirus. While I was working at E. 76th Street, Vidal typically came to the job site about twice per week. During his visits, Vidal told me many times that he was going to fire everyone, and that the only ones who could stay were the ones who had papers.

135.    "Vidal also asked me many times why we were suing him and Dobbin. I wouldn't respond to Vidal when he said things like that to me, or when he asked me questions about suing him. Dobbin also came to the job site on occasion, but I tried to not look at him, because Dobbin was always looking in an angry way at me. During these visits, Dobbin did not say anything to me, and I did not say anything to him."

136.    One day in mid-March 2020, Vidal came to the job site and told all the workers that we were all fired because of the Covid situation. Since then Highline Construction Inc. reopened but Plaintiffs have yet to be called back to the job.

137.    Defendants thus subjected Plaintiffs to pretextual firing because of their protected activity, by failing to recall them to work.

## FIRST CAUSE OF ACTION
### (RACIAL DISCRIMINATION UNDER THE NYCHRL--DISPARATE TREATMENT AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS)

138.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

139.    Defendants have discriminated against Plaintiffs on the basis of their being Hispanic in violation of the NYCHRL by subjecting Plaintiffs to disparate treatment in the form of disparate work rules, and disparate workload in part because of their Hispanic race.

140.    All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

141.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

142.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this they are entitled to an award of monetary damages and other relief.

143.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(RACIAL DISCRIMINATION UNDER THE NYCHRL—HOSTILE WORK**
**ENVIRONMENT AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS)**

144.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

145.    Defendants have discriminated against Plaintiffs on the basis of their being Hispanic in violation of the NYCHRL by subjecting Plaintiffs to a hostile work environment in the form of subjection them to racially hostile treatment including but not limited to subjecting them to racially charged epithets, dangerous and unsafe working conditions, and indifference to their injuries in part because of their Hispanic race.

146.    All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

147.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

148.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this they are entitled to an award of monetary damages and other relief.

149.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### (PERCIEVED IMMIGRATION STATUS DISCRIMINATION UNDER THE NYCHRL--DISPARATE TREATMENT AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS)

150.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

151.    Defendants have discriminated against Plaintiffs on the basis of their perceived immigration status in violation of the NYCHRL by subjecting Plaintiffs to disparate treatment in the form of, disparate work rules, disparate pay and disparate workload in part because of their perceived immigration status.

152.    All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

153.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

154.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this they are entitled to an award of monetary damages and other relief.

155.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(PERCEIVED IMMIGRATION STATUS DISCRIMINATION UNDER THE NYCHRL—HOSTILE WORK ENVIRONMENT AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS)**

156.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

157.    Defendants have discriminated against Plaintiffs on the basis of their perceived immigration status in violation of the NYCHRL by subjecting Plaintiffs to a hostile work environment in the form of subjection them to a hostile treatment including but not limited to subjecting them to degrading epithets, dangerous and unsafe working conditions, and indifference to their injuries in part because of their perceived immigration status.

158.    All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

159.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

160.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this they are entitled to an award of monetary damages and other relief.

161.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(NATIONAL ORIGIN DISCRIMINATION UNDER THE NYCHRL--**
**DISPARATE TREATMENT AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS)**

162.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

163.    Defendants have discriminated against Plaintiffs on the basis of their Indigenous Mexican origin status in violation of the NYCHRL by subjecting Plaintiffs to disparate treatment in the form of disparate work rules, and disparate workload in part because of their national origin.

164.    All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

165.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

166.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this they are entitled to an award of monetary damages and other relief.

167.     Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (NATIONAL ORIGIN DISCRIMINATION UNDER THE NYCHRL—HOSTILE WORK ENVIRONMENT AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS)

168.     Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

169.     Defendants have discriminated against Plaintiffs on the basis of their Indigenous Mexican origin status in violation of the NYCHRL by subjecting Plaintiffs to a hostile work environment in the form of subjection them to a hostile treatment including but not limited to subjecting them to degrading epithets, dangerous and unsafe working conditions, and indifference to their injuries in part because of their national origins.

170.     All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

171.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

172.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this they are entitled to an award of monetary damages and other relief.

173.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (NEW YORK STATE MINIMUM WAGE ACT - OVERTIME CLAIM, NYLL §650 ET SEQ., BROUGHT BY PLAINTIFFS AGAINST ALL DEFENDANTS)

174.    Plaintiffs repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

175.    Throughout the period covered by the applicable statute of limitations, Defendants willfully and repeatedly failed to pay Plaintiffs at the overtime rate for hours worked in excess of forty (40) hours per workweek as required by NYLL, paying Plaintiffs straight time for all hours worked.

176.    Defendants' failure to pay Plaintiffs overtime was willful within the meaning of the NYLL.

## EIGHTH CAUSE OF ACTION
### (FEDERAL LABOR STANDARD ACT - OVERTIME CLAIM, BROUGHT BY PLAINTIFFS ON BEHALF OF THEMSELVES AND ALL SIMILARLY SITUATED COLLECTIVE ACTION PLAINTIFFS AGAINST ALL DEFENDANTS)

177.    Plaintiffs, on behalf of themselves and those similarly situated, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

178.    Throughout the period covered by the applicable statute of limitations, Defendants

willfully and repeatedly failed to pay Plaintiffs and all similarly situated persons at the overtime rate for hours worked in excess of forty (40) hours per workweek as required by FLSA, paying Plaintiffs straight time for all hours worked.

179.    Defendants' failure to pay Plaintiffs overtime was part of a plan to deprive them of their lawful pay in violation of FLSA 207.

180.    Defendants' failure to pay Plaintiffs overtime was willful within the meaning of the FLSA.

## NINTH CAUSE OF ACTION
**(NOTICE-AND-RECORDKEEPING REQUIREMENTS, NYLL § 195(1), BROUGHT BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**

181.    Plaintiffs repeat, reiterate, and incorporate each and every preceding paragraph as if set forth fully herein.

182.    Defendants have failed to provide Plaintiffs with wage notices as required on February 1 of every year in violation of NYLL § 195(1).

183.    Defendants' failure to pay issue such notices was willful within the meaning of the NYLL.

## TENTH CAUSE OF ACTION
**(NOTICE-AND-RECORDKEEPING REQUIREMENTS, NYLL § 195(3), BROUGHT BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**

184.    Plaintiffs, reiterate, and incorporate each and every preceding paragraph as if set forth fully herein.

185.    Defendants have failed to provide Plaintiffs with wage statements or explanations of how their wages were calculated in violation of NYLL § 195(3).

186.    Defendants' failure to pay issue such statements was willful within the meaning of the NYLL.

**ELEVENTH CAUSE OF ACTION**
**(PAY DISPARITY PURSUANT TO NYLL 194(1) AGAINST DEFENDANTS)**

187.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

188.    Based on those allegations, Defendants, as their employers exercising operational control, subjected Plaintiffs to disparate pay on the basis of their National Origin by paying Plaintiffs a lesser rate of pay of approximately $5 to 6 per hour than that paid to employees of other National Origin for the first 40 hours and a lesser rate of pay of approximately $7.50 to $9 per hour for all hours worked in excess of 40 per week, while performing "substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions as their comparators.

189.    The pay discrepancy Plaintiffs and employees of other between National Origin cannot be accounted for by a seniority system; (b) a merit system; or (c) bonafide factor other than their National Origin.

190.    Plaintiffs seek to recover her unpaid compensation, and treble damages pursuant to the NYLL, attorneys' fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**(RETALIATION IN VIOLATION OF THE NYCHRL § 8-107(7))**

191.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

192.    During the period covered by the applicable statute of limitations, Defendants retaliated against Plaintiffs by threatening them with termination and in fact terminating their

employment for making complaints regarding their discrimination to the Department of Labor and to their private attorney, undersigned counsel.

193.    As a result of this retaliation, these Plaintiffs were terminated and seek their damages, in the form of backpay and frontpay.

## THIRTEENTH CAUSE OF ACTION
## (RETALIATION IN VIOLATION OF NYLL 215)

194.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

195.    During the period covered by the applicable statute of limitations, Defendants retaliated against Plaintiffs by threatening them with termination and in fact terminating their employment for making complaints regarding their pay to the Department of Labor and to their private attorney, undersigned counsel.

196.    As a result of this retaliation, these Plaintiffs were terminated and seek their damages, as well as penalties for retaliation allowed under the NYLL.

## FOURTEENTH CAUSE OF ACTION
## (RETALIATION IN VIOLATION OF FLSA 215)

197.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

198.    During the period covered by the applicable statute of limitations, Defendants retaliated against Plaintiffs by threatening them with termination and in fact terminating their employment for making complaints regarding their pay to the Department of Labor and to their private attorney, undersigned counsel.

199.    As a result of this retaliation, these Plaintiffs were terminated and seek their damages, as well as penalties for retaliation allowed under the FLSA

## FIFTEENTH CAUSE OF ACTION
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

200.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

201.    The wrongful conduct of Defendants, as alleged herein by knowingly repeatedly exposing Plaintiffs to deadly asbestos without PPE, was extreme and outrageous.

202.    Defendants conduct was atrocious; beyond all possible bounds of decency; was utterly intolerable in a civilized community or society; and/or was without privilege.

203.    The wrongful conduct of Defendants, as alleged herein was intended to cause, and did cause, severe emotional distress to Plaintiffs.

204.    Defendants by their complained of conduct, did intentionally inflict severe emotional distress upon Plaintiffs, and did cause Plaintiffs to suffer severe emotional distress, and Plaintiffs are thereby entitled to punitive damages.

**WHEREFORE**, Plaintiffs request relief as follows:

A. An order declaring that the actions of Defendants alleged in this complaint violate NYCHRL;

B. An award of compensatory damages in an amount that would fully compensate Plaintiffs, plus prejudgment interest, for the economic loss in the form of back pay and front pay, mental anguish, emotional pain and suffering, humiliation, embarrassment, emotional distress, feelings of paranoia and distrust, depression, low self-esteem, sleep deprivation, loss of enjoyment of life and interference with life's daily activities as well as continued stress and anxiety caused by Defendants' violations of the law alleged in this complaint, in an amount to be determined at trial;

C. An award of punitive damages to Plaintiff in an amount that would punish Defendants for the willful, wanton, reckless misconduct alleged in this Complaint that would effectively deter Defendants from future discrimination and other unlawful behavior, in an amount to be determined at trial.

D. An order declaring that Defendants violated the NYLL in the manners stated in this complaint;

E. An order declaring that Defendants' violations of the NYLL and FLSA were willful;

F. An award of overtime compensation under the NYLL and FLSA;

G. An award of liquidated damages pursuant to the NYLL and FLSA;

H. An award of disparate pay compensation under the NYLL and treble liquidated damages pursuant to NYLL § 194(1);

I. An award of damages for violations of NYLL;

J. An award of $10,000 each in penalties to Plaintiffs for the retaliatory acts of Defendants pursuant to NYLL §215 and FLSA 216(b);

K. Designation of this action as a collective action for the purposes of the claims brought on behalf of the FLSA Collective Plaintiffs, along with prompt issuance of opt-in notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the opt-in class;

L. Designation of Plaintiffs as representatives of the FLSA Collective Plaintiffs;

M. All penalties available under the applicable laws;

N. Attorneys' fees pursuant to 29 U.S.C. §216, NYLL §663 and all other applicable statutes;

O. Interest as provided by law;

P. An award of reasonable attorneys' fees, the fees and costs of experts, and the costs of this action; and

Q.  Such other relief as this Court deems just and proper.

## JURY TRIAL

Plaintiffs demand a jury trial for all causes of action and claims for which they have a right to a

jury trial.

Dated: March 17, 2021

Respectfully submitted,

MIRER MAZZOCCHI & JULIEN, PLLC

By: Kristina Mazzocchi

*Attorney for Plaintiffs*
Mirer Mazzocchi & Julien, PLLC
1 Whitehall St., 16th floor
New York, NY 10004
(212) 231-2235
kmazzocchi@mmsjlaw.com